IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 2:25-cr-01123 |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | |
| FERNANDO SAN DIEGO SAN JUAN | ) | |

**STIPULATION OF FACTS IN SUPPORT OF GUILTY PLEA**

The government presents to the Court, by and through the attorneys for the Environmental Crimes Section of the Department of Justice and the Assistant United States Attorneys in and for the District of South Carolina, joined by Defendant Fernando San Diego San Juan ( "Defendant"), and Defendant's attorney Brian T. McCarthy, this factual basis in support of Defendant's plea of guilty to Counts One and Two of the Information in this case and in support thereof, would show the following:

1. Defendant was the Chief Engineer of the *M/V* ("*Motor Vessel*") *MSC Michigan VII* from on or about April 24, 2024, until on or about July 16, 2024. *See* Photographs 1-3 *infra*.

2. The *M/V MSC Michigan VII* was a 74,583 gross ton ocean-going container ship registered in Liberia and had an International Maritime Organization number of 9196864. The vessel transported cargo worldwide including to and from Charleston, SC.

1

3. Company A was a ship management company that operated a fleet of sea-going vessels, including the *M/V MSC Michigan VII.* Company B was the registered owner of the *M/V MSC Michigan VII.*

4. The *M/V MSC Michigan VII* had a crew that included a Master, Chief Officer, Chief Engineer (Defendant), Second Engineer, Third Engineer, Fourth Engineer, Fitter, Electrician and three Oilers. The Master had overall responsibility for the vessel, the Chief Officer was responsible for the deck department, and the Chief Engineer oversaw the Engineering Department. The subordinate Engineering Department crew members reported to the Second Engineer, who reported directly to the Chief Engineer. Defendant and the rest of the crew were agents of Companies A and B and acted within the scope of that agency and for the intended benefit, at least in part, of Companies A and B.

5. When Defendant joined the vessel in April 2024, he was only given approximately five hours to complete a mandatory handover from the departing Chief Engineer. The handover process is designed to provide the incoming Chief Engineer with a detailed understanding of the vessel's engine room operations, machinery operations, maintenance plans, and current issues or malfunctions in the engine room. A proper and complete handover ensures that all necessary information is conveyed accurately. In Defendant's experience, the mandatory handover should have taken place over at least 24 hours. A five-hour handover was insufficient for Defendant to obtain a complete picture of the status of the engine room and all the vessel's critical machinery.

6. There were numerous problems with equipment in the engine room. For instance, the vessel was fitted with three Main Air Compressors: (1) two primary compressors and (2) one emergency back-up compressor. Main Air Compressors are considered critical equipment on a vessel as they provide the compressed air necessary for starting main and auxiliary engines, as well as powering various other vital systems. The Main Air Compressors are essential for the safe and efficient operation of the vessel, and both international and classification standards require redundant systems for this critical equipment.

7. Shortly after arriving on board, Defendant observed oil and air leaking from the crankcase safety valve of Main Air Compressor No. 1. The compressor was stopped, and the crankcase was disassembled. Defendant observed the oil in the crankcase was fouled with carbon and dirt. The compressor's high-pressure delivery valve and low-pressure delivery valve were then dismantled, and Defendant observed that the high-pressure delivery valve was damaged and needed to be replaced. A reconditioned spare valve was installed, and the Main Air Compressor No. 1 was put back into operation. However, shortly thereafter the compressor failed again, and it was taken offline as the vessel lacked the necessary spare parts to make a second round of repairs.

8. On June 4, 2024, Defendant observed that the Main Air Compressor No. 2 was not functioning properly and was not producing sufficient compressed air to charge the vessel's compressed air reserve. After servicing the Main Air Compressor No. 2, Defendant was able to get Main Air Compressor No. 2 to approximately 60% of its

rated capacity. On the same day, Defendant drafted a Statement of Facts for transmission to the shoreside office of Company A. In this Statement of Facts, Defendant also identified the spare parts he required to repair the Main Air Compressor units. The vessel's Master notified the shoreside office of Company A, via electronic mail, that one of the vessel's Main Air Compressors was out of order and the other was in a poor state. Defendant's Statement of Facts was included in the email the Master sent to Company A. No spares for the Main Air Compressor System were delivered to the vessel before departure from Charleston. Therefore, the vessel was at risk of not having sufficient air to start the Main Engine during maneuvering.

9. After Defendant joined the vessel, he also became aware that most of the vessel's generators could not sustain a power load of seventy five percent (75%). Generator Number 1 operated at approximately 56-60% of rated load capacity. Generator Number 2 operated at approximately 75% of rated load capacity. Generator Number 3 operated at approximately 56-60% of rated load capacity. Generator Number 4 operated at approximately 56-60% of rated load capacity. These reduced loads were reported to the vessel's Superintendent by Defendant.

10. Because of the reduced load capacity of the generators, many times the vessel could not use its bow thruster while maneuvering in port. While the vessel was in Panama, the vessel's Superintendent instructed the vessel's Electrician to manage the vessel's generators in manual settings to determine whether enough load capacity could be sustained to use the vessel's bow thruster. This required the vessel's ovens,

the vessel's air conditioning system, and the vessel's incinerator to be powered off to maintain the load requirements of the bow thruster. This is not the standard operating procedure for a vessel to use its bow thruster and the condition of the generators created a risk that the vessel could experience a blackout if the bow thruster was used in port.

11. Soon after joining the vessel in April 2024, Defendant also became aware that the vessel's freshwater cooling system had a leak and the cooling water for the lube oil system had also developed a leak. Defendant was informed by members of the engine room crew that these leaks occurred before the dry-docking of the vessel and the attempts to repair the leaks in dry dock were unsuccessful. Because of the active leak, Defendant would check the lube oil levels and confirmed the oil levels were dropping and more oil was contaminating the cooling system. The oil contamination in the cooling system could cause gaskets and seals to fail, including seals on the cooling pumps. While Defendant was still serving as the vessel's Chief Engineer, he took a picture of damage caused to a cooling pump by this oil contamination and sent it to the vessel's Superintendent.

12. Defendant also had responsibility for the Main Engine governor (governor). The Governor controlled the amount of fuel that was supplied to the Main Engine. The Governor consisted of several parts including an electronic mechanism that would rotate depending on the speed input (revolutions per minute or "RPM") signal that it received from either the telegraph on the bridge or the telegraph in the engine control room. *See* Photographs 4-6 *infra*. A telegraph is used to change the direction

and speed of the main engine. Telegraph commands include forward bells of dead slow (28 RPM at 6.85 knots), slow (40 RPM at 9.80 knots), half (55 RPM at 13.45 knots) and full (75 RPM at 18.36 knots). One knot equals 1.15 miles per hour.

13. A linkage rod is attached to the electronic mechanism on the Governor that rotates. The other end of the linkage rod is attached to the fuel rack for the Main Engine. The fuel rack supplies fuel to each of the cylinders on the Main Engine. The linkage rod connected to the fuel rack rises or falls depending on the telegraph input. The length of the linkage rod is adjustable and is calibrated by a technician. Once the length of the linkage rod is calibrated, it is locked into place with locking washers and nuts. Under no circumstances should the length of the linkage rod be manually adjusted to change the fuel supply to the fuel rack unless done so by a trained technician. None of the engineering crew, including Defendant, were trained technicians qualified to make manual adjustments on the Governor and linkage rod. *See* Photographs 7-9 *infra* taken by the U.S. Coast Guard after the incident.

14. Shortly after Defendant boarded the vessel on April 24, 2024, near Santos, Brazil, he became aware that the RPMs ordered by the bridge telegraph could be achieved only if the length of the linkage rod between the Governor and fuel rack was manually adjusted. Defendant later learned in Charleston that this was caused by the poor condition of the Main Engine fuel injector systems and leakages in the barrels and plungers when using lower viscosity low sulfur fuel, resulting in the Main Engine requiring more fuel to achieve a specific RPM when using the lower viscosity fuel.

6

15. Defendant learned that when the vessel was maneuvering, i.e., entering or departing a port, the engineering crew had to pay attention to the bridge telegraph order that could be seen in the engine control room. They would then go down below in the engine room to the Governor and manually adjust the length of the linkage rod until the desired RPM was reached, as shown by an RPM gauge located next to the linkage rod. Additionally, on occasion, a crewmember on the bridge, including the Master, would call the engine control room and request the RPMs be raised or lowered to match the telegraph.

16. When Defendant learned about this practice, he knew that it was hazardous because manually adjusting the length of the linkage rod could cause it to fail. Nevertheless, he allowed the practice to continue.

17. On or about May 13, 2024, through on or about May 19, 2024, the vessel was in Panama. During that time, a Superintendent from Company A attended the vessel. While in Panama, Defendant, the Superintendent, and the Master met. During the meeting, the Master brought up the subject that there was a mismatch between the RPMs ordered on the bridge telegraph and the actual RPMs achieved by the Main Engine. Defendant stated to the Master and Superintendent that the Governor had to be adjusted to achieve proper RPMs. The Superintendent conducted a test of the Main Engine and the telegraph using high viscosity heavy fuel oil and the RPMs of the Main Engine matched the telegraph input. However, the Superintendent did not conduct a test using the lower viscosity lower sulfur fuel required to be used when the vessel was maneuvering, that is, when the vessel would enter or leave a port.

7

18. The nuts on both ends of the linkage rod were loosened by the engine room crew, who were supervised by Defendant, so that the rod could be more easily turned to adjust its length and, therefore, the Main Engine RPMs. The system was designed so that on each end of the linkage rod was a locking washer that would hold the nuts in place so they could not back out. However, on the *M/V MSC Michigan VII*, both the upper and lower locking washers were removed. The U.S. Coast Guard found one of the locking washers on the floor beneath the Governor. *See* Photographs 10-12 *infra*.

19. On June 5, 2024, at approximately 11:45 am, the vessel departed from Charleston, South Carolina using low sulfur fuel. The intended track of the vessel was to proceed upstream in the Cooper River to a turning basin. Once the vessel was turned around, using the assistance of its bowthruster, it would proceed downbound along the Cooper River, beneath the Arthur Ravenel Jr. Bridge, and then through Charleston Bay and out to sea. The Arthur Ravenel Jr. Bridge is an eight-lane major thoroughfare that spans 2.5 miles and connects Charleston with Mount Pleasant.

20. As the vessel completed its turn in the basin, the bridge telegraph was moved to dead slow ahead. The main engine responded appropriately and achieved the proper rpm. A short while later, another bridge telegraph command was given for slow ahead. At this point, the Third Engineer can be seen on closed circuit television ("CCTV") watching the rpms after the slow ahead command. The Third Engineer realized the main engine was not achieving the ordered rpms and can be seen making a twisting motion with his hands to the Oiler that was present and then he

departs the engine control room. He made an adjustment on the linkage rod by twisting it and returned to the engine control room. Soon thereafter, the linkage rod disconnected from the Governor.

21. Defendant was in the engine room at the time the linkage rod was disconnected. Defendant unsuccessfully tried to re-connect the linkage rod. Defendant then ran to the engine control room to get assistance from the other engineers in an effort to re-connect the linkage rod. The engineers made several unsuccessful attempts to re-connect the linkage rod. Defendant then ordered that the Fitter report to the engine room. The linkage rod was fully disconnected and brought to the engine room workshop. The male threads on the linkage rod were worn and partially stripped. Once the vessel was at sea, the fitter was able to cut off some of the damaged threads from the end of the rod and cut new threads using a die. *See* Photograph 13 *infra*. The engineers were then able to re-connect the linkage rod and regain control of the main engine.

22. During the time the engineers were attempting to re-connect the linkage rod, the vessel was proceeding outbound as a runaway ship because the main engine could not be slowed. The vessel achieved a speed of approximately 16-17 knots. The Arthur Ravenel Jr. Bridge was evacuated over concern the vessel could strike the bridge. Local beaches were also cleared because of concern that the wake of the vessel could cause injuries to persons on the beach. The vessel's wake caused damage to numerous ships and piers and caused injuries to several people.

23. The U.S. Coast Guard and the National Transportation Safety Board investigated

the incident. On June 5, 2024, Defendant was interviewed as part of the investigation. During the interview, Defendant was asked if the linkage rod was ever adjusted. Defendant lied and said that the crew never adjusted the linkage rod and only a qualified technician would adjust the linkage rod.

24. On June 8, 2024, the National Transportation Safety Board and the U.S. Coast Guard conducted another interview of Defendant as part of their investigation. Defendant was asked whether there had been a delay between the bridge telegraph and the main engine response in the past. He lied and said there had not been. When Defendant made that statement, he knew that in the past the Governor linkage rod had to be manually adjusted to reach the telegraph command input which in fact caused a delay for the main engine to reach the desired rpm. Defendant was asked again if anyone had ever adjusted the linkage rod and he falsely answered no. Defendant also stated that the crew should never adjust the linkage rod and that only a technician should adjust the linkage rod. Defendant was asked whether he knew that the crew were making manual adjustments to the linkage rod, and he lied and said that he was unaware of that. Defendant admits that he lied to the NTSB and obstructed an agency investigation.

25. During the U.S. Coast Guard inspection of the vessel after the runaway incident, Defendant approached the Fourth Engineer and told him that he had told the Coast Guard that he did not see anyone adjust the linkage rod and he told the Fourth Engineer to say the same thing to the U.S. Coast Guard so they would be on "the same page." Defendant also told this to the Second Engineer and Third Engineer.

Defendant was attempting to persuade these witnesses not to admit to the U.S. Coast Guard that there had been manual adjustments to the linkage rod.

26. Defendant admits that both the failure of the engine to achieve the rpms dictated by the bridge telegraph and the manual adjustment to the linkage rod during maneuvering constituted a hazardous condition that should have been reported to the U.S. Coast Guard. Defendant admits that he aided and abetted the vessel's Master's failure to notify the U.S. Coast Guard of the hazardous conditions.

Photograph 1



Starboard forward quarter of M/V
MSC Michigan VII.

Photograph 2



Starboard side of M/V MSC
Michigan VII.

Photograph 3



Stern of M/V MSC Michigan VII.



Center of bridge. Telegraph set at "stop" position.



Port side of bridge. Telegraph set in the "stop" position.



Engine Control Room. Telegraph set at the "stop" position.

Photograph 7



RPM Gauge.

Linkage rod with
no locking washer.

Photograph 8



Governor face-on view. The locking washer is missing on lower end of upper linkage rod.

Locking washers in place on lower section linkage rods of Governor.



Locking washer missing on upper end of upper linkage rod.

Photograph 10



Locking washer found below Main Engine Governor.

Photograph 11



Locking washer found below Main Engine Governor.

Photograph 12



Close-up of locking washer found on floor beneath the Main Engine Governor.



Pieces of steel cut off the male ends of the linkage rod.



Main Air Compressor #2 – disassembled and out of commission.



Main Air Compressor #1 with
pooled oil underneath.